**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

| | FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE) |
|---|---|

**NOTICE TO DEFENDANT:**
_(AVISO AL DEMANDADO):_

COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE
HOME LOANS, INC., BANK OF AMERICA, N.A. and Does 1 to 20
inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
_(LO ESTÁ DEMANDANDO EL DEMANDANTE):_

Tyrone and Rachelle Potts

**ORIGINAL FILED**
Northwest District

APR 14 2014

LOS ANGELES
SUPERIOR COURT

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

_¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación._

_Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia._

_Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso._

| The name and address of the court is:<br>_(El nombre y dirección de la corte es):_ Van Nuys Courthouse East<br><br>6230 Sylmar Ave, Van Nuys, CA 91401 | CASE NUMBER:<br>_(Número del Caso):_ **LC101535** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
_(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):_
Law Offices of Johnson|Omotosho, LLP 8616 La Tijera Blvd. Ste. 502, Los Angeles, CA 90045 424)218-9745

| DATE: 03/26/2014<br>_(Fecha)_ | Clerk, by<br>_(Secretario)_ | , Deputy<br>_(Adjunto)_ |
|---|---|---|

_(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)_
_(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010))._

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

Carter, Executive Officer/Clerk

APR 14 2014

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of _(specify):_

3. ☑ on behalf of _(specify):_ COUNTRYWIDE FINANCIAL CORPORATION

   under: ☑ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
   ☐ other _(specify):_

4. ☐ by personal delivery on _(date):_

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

1   | **AYO OMOTOSHO ESQ. SBN 279524**
2   | **JOY JOHNSON ESQ. SBN:251639**
    | **JOHNSON|OMOTOSHO, LLP**
3   | **8616 LA TIJERA BLVD SUITE 502**
    | **LOS ANGELES, CA 90045**
4   | **TEL: (424) 218-9745**
    | **FAX: (323) 967-7073**
5   |

RECD BY U.S. MAIL.
APR 14 2014
LA.S.C.-Northwest East

ORIGINAL FILED
Northwest District

APR 14 2014

LOS ANGELES
SUPERIOR COURT

6   | Attorneys for Plaintiffs: Tyrone Potts
7   |                          Rachelle Potts

8

9   | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
    | **FOR THE COUNTY OF LOS ANGELES,**

10  | Tyrone Potts and Rachelle Potts,          | CASE No:        **LC101535**

11  |          Plaintiffs

12  |          vs.                              | **VERIFIED COMPLAINT FOR:**

13  |                                           | 1. **VIOLATION OF CALIFORNIA**
                                                   **BUSINESS AND PROFESSIONS**
14  | COUNTRYWIDE FINANCIAL                         **CODE § 17500**
    | CORPORATION, COUNTRYWIDE                  | 2. **BREACH OF COVENANT OF**
15  | HOME LOANS, INC., BANK OF                     **GOOD FAITH AND FAIR**
    | AMERICA, N.A., and DOES 1 TO 20,             **DEALING**
16  | inclusive,                                | 3. **VIOLATION OF CALIFORNIA**
                                                   **BUSINESS AND PROFESSIONS**
17  |          Defendants.                         **CODE § 17200, ET SEQ.**
                                                4. **PROMISSORY ESTOPPEL**
18  |                                           | 5. **VIOLATION OF CALIFORNIA**
                                                   **FINANCIAL CODE SECTION 4970**
19  |                                           | 6. **NEGLIGENCE;**
20  |                                           | 7. **NEGLIGENT INFLICTION OF**
                                                   **EMOTIONAL DISTRESS;**
21  |                                           | 8. **NEGLIGENT**
                                                   **MISREPRESENTATION**
22  |                                           | 9. **CALIFORNIA CONSUMER**
                                                   **CREDIT REPORTING**
23  |                                           | 10. **VIOLATIONS OF FAIR HOUSING**
24  |                                               **ACT and EQUAL CREDIT**
                                                   **OPPORTUNITY ACT**
25  |                                           | **Declaration of Plaintiff, Tyrone Potts**

26  |                                           | **Demand for Jury Trial**

27

28

1

COMPLAINT

COME NOW the Plaintiffs TYRONE POTTS and RACHELLE POTTS ("Plaintiffs") by and through their counsel for their Complaint against Defendants, COUNTRYWIDE FINANCIAL CORPORATION, a Delaware Corporation, COUNTRYWIDE HOME LOANS, INC, a New York Corporation, COUNTRYWIDE BANK and DOES 1 TO 20, inclusive, (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1. Plaintiffs, Tyrone and Rachelle Potts began searching for a home in early December 2006.

2. Plaintiffs received a referral to Waterview Financial to assist with obtaining financing for the purchase of their new home.

3. Waterview Financial is owned by Nancy Mirras and her husband Nick Mirras. The Mirras' are former Countrywide employees.

4. Plaintiffs had a mid range credit score of 749. Nancy Mirras informed them that their credit was "excellent".

5. Plaintiffs were prequalified for $1,400,000 (a first mortgage of $1,050,000 and a second for $350,000).

6. Plaintiffs were advised to seek a stated income loan because they were both self employed.

7. Despite having "excellent credit", Plaintiffs were offered an interest-only ARM on the first mortgage of $1,000,000 with an initial rate of 7.375%. The second mortgage was in the form of a home equity line of credit(HELOC). The HELOC was an interest-only ARM for $470,000 with an initial interest rate of 12%.

8. Plaintiffs were told not to worry about the interest rates and they were ensured that they would be able to refinance within a few months.

9. The initial monthly payment on the first mortgage was approximately $7,800 and the initial payment on the HELOC was approximately $4,700.

COMPLAINT

10. Within a few months Plaintiffs tried to refinance their first and second mortgages as they were promised. However, they were repeatedly told that Countrywide's lending guidelines have changed, unfortunately it was too soon and the comparable sales did not support the refinancing of their home.

11. Plaintiffs would not have agreed to the loan terms if they knew that they would not be able to refinance out of the exuberant interest rates.

12. In the summer of 2008 Tyrone Potts lost an employment contract and he and his wife were only able to survive by making partial payments on the first and second mortgages.

13. Failure to make loan payments had a negative impact on Plaintiffs' credit. Plaintiffs' were also forced to stop making credit card payments. Most credit cards cancelled Plaintiffs' accounts, and/or raised Plaintiffs' interest rates for defaulting on payments. Plaintiffs' poor credit scores impacted their ability to get jobs when they tried to transition from self-employment.

14. Through this action, Plaintiffs seek damages resulting from Defendants' negligent and unlawful conduct.

## PARTIES AND JURISDICTION

15. Plaintiffs are now, and at all times mentioned herein are, individuals residing in the County of Los Angeles, in the State of California.

16. At all relevant times to the events at issue in this complaint, Defendant Countrywide Financial Corporation ("CFC"), was a Delaware corporation, its principal business office in Calabasas, California. CFC with has transacted and continues to transact business throughout the State of California, including in Los Angeles County. CFC created, authorized, and/or ratified the lending-related policies and practices at issue in this complaint that its divisions and subsidiaries

3

COMPLAINT

implemented.

17. At all relevant times to the events at issue in this complaint, Defendant Countrywide Home Loans, Inc.("CHL"), was a New York corporation with its principal business office in Calabasas, California. CHL has transacted and continues to transact  business throughout the State of California, including in Los Angeles County. CHL is a subsidiary of CFC.

18. On July 1, 2008, Bank of America Corporation ("BAC"), a Delaware incorporated financial holding company, acquired ownership of CFC, including all of its subsidiary business entities. Since that acquisition, CFC has remained a Delaware incorporated company with its principal business office in Calabasas, California, as a direct, wholly owned subsidiary of BAC.

19. The Defendants identified in 16-18 shall be referred to collectively as "Defendants."

20. Plaintiffs are ignorant of the true identities and capacities of Defendants designated as Does 1 - 20, but will amend the Complaint when their identities have been ascertained according to proof within the time permitted.  However, Plaintiffs allege on information and belief, that each and every Doe Defendant is in some manner responsible for the acts and conduct of the other Defendants, and were, and are responsible for the injuries, damages, and harm incurred by Plaintiffs.  Plaintiffs further allege on information and belief that each such designated Defendant acted, and acts, as the authorized agent, representative, and associate of the other Defendants in doing the things alleged herein.

21. Whenever reference is made in this Complaint to any act of any defendant(s), that allegation shall mean that each defendant acted individually and jointly with the other defendants.

22. Any allegation about acts of any corporate or other business defendant means that the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their

4

authority.

23. At all relevant time, each defendant committed the actions, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the defendants acted as the agent of the other defendants, and all of the defendants acted within the scope of their agency if acting as an agent of another.

24. At all relevant times, each defendant knew or realized that the other defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that other defendants were engaging in or planning to engage in unlawful conduct, each defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other defendants in the unlawful conduct.

25. At all relevant times, Defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint. This conspiracy, common enterprise, and common course of conduct continues to the present.

26. The violations of law alleged in this Complaint occurred in Los Angeles, County.

## FACTUAL BACKGROUND

27. Plaintiffs are the owners of the property known as 14400 Greenleaf Street Sherman Oaks, CA. 91423.

28. In early December 2006 while Plaintiffs sought to purchase a new home they used Waterview Financial to help them obtain financing.

29. Waterview Financial is owned by Nick Mirras and his wife Nancy Mirras. Nick and Nancy Mirras are both former employees of Countrywide financial.

30. On December 15, 2006 Plaintiffs' credit score was ran by Waterview Financial and it

5

COMPLAINT

was determined that the mid range was 749 which was excellent.

31. Plaintiffs were prequalified for $1,400,000 which consisted of a first mortgage in the amount of $1,050,000 and a second mortgage in the amount of $350,000). The prequalification was based on the income amount that the Plaintiffs were lead to believe would allow them to purchase the home of their dreams.

32. Within a few days Plaintiffs found a home, made an offer, and

33. Plaintiffs' were advised to use Stated Income because they were self employed and the requirements are less stringent.

34. Plaintiffs had two promising estimates for the financing of their new home. The first lender was very attractive but required Plaintiffs to put $17,500 down.

35. The Mirras as former employees of Countrywide had a good working relationship with Countrywide lending agent Karen Griese. Countrywide enticed Plaintiffs into using their services by not requiring any money as a down payment. Countrywide financed 100% of the loan.

36. The property that Plaintiffs intended to purchase appraised for $1,470,000. Karen Griese and her son Robert led Plaintiffs to believe that they were working to help them obtain the best interest rates possible.

37. The rate offered on the first mortgage of $1,000,000 was 7.375% interest only ARM. The second mortgage was in the form of a home equity line of credit(HELOC). The HELOC was also an interest only ARM with an initial interest rate of 12%.

38. The initial monthly payment on the first mortgage was approximately $7,800 and the initial payment on the HELOC was approximately $4,700.

39. Plaintiffs were never given an explanation as to why the interest rates for their loans were so high despite the fact that they had excellent credit.

6

COMPLAINT

40. Plaintiffs were never given an explanation of the interest rates or the downside to having a HELOC.

41. Plaintiffs did not fully understand how an ARM loan worked.  Plaintiffs accepted the loan terms only because they were told that they would be able to refinance out of the high interest rates in a short period.

## FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
## VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17500
## (UNTRUE OR MISLEADING STATEMENTS)

42. Plaintiffs hereby  reallege and incorporate by this reference all aforementioned paragraphs, as though fully set forth herein.

43. Defendants have violated Business and Professions Code section 17500 by making or disseminating untrue or misleading statements, or by causing untrue or misleading statements to be made or disseminated, in or from California, with the intent to induce Plaintiffs to enter into a mortgage loan and home equity line of credit secured by their primary residence. These untrue and misleading statements include but are not necessarily limited to:

    a.   Statements about the benefits of the Stated Income lending program

    b.   Statements regarding the duration of interest only payments, and statements obfuscating the risks associated with such mortgage loans

    c.   Statements regarding the terms and payment obligations of HELOCs

    d.   Statements that the Plaintiffs would be able to refinance the high interest rates within a couple of months

50. Defendants knew, or by the exercise of reasonable care should have known, that these statements were untrue or misleading at the time that they were made.

## SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

51. Plaintiffs reallege and incorporate all of the paragraphs above, as though fully set forth herein.

7

52. The "implied covenant of good faith and fair dealing" is implied in law from a contractual relationship and arises only when there is a valid and existing contract.' *Grunberg v. Aetna Ins. Co., 9Cal.3d 566, 577-78 (1973).*

53. "There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."*Comunale v. Traders & General Ins. Co., 50 Cal.2d 654, 658 (1958).*

54. This covenant protects the benefits of the contract that the parties reasonably contemplated when they entered into the agreement.

55. The aforementioned agreement and representations between Plaintiffs and Defendants constituted a contract between the parties that implied a covenant of good faith and fair dealing which Defendants clearly breached by failing to allow Plaintiffs to refinance out of the exuberant interest rates as promised.

56. As a result of the breach of this covenant by Defendants, Plaintiffs' home is threatened with an imminent foreclosure sale which will deprive Plaintiffs of their ownership right to their home. Plaintiffs have suffered enormous stress and fear at the impending loss of their home. Plaintiffs' credit has been adversely effected and they are overwhelmed with despair.

### THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS

### VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17200

### (UNFAIR COMPETITION)

57. Plaintiffs hereby reallege and incorporate by this reference all aforementioned paragraphs, as though fully set forth herein.

58. The California Unfair Competition Law ("UCL") prohibits "unfair competition," which is defined by Business and Professions Code section 17200 as including "any unlawful, unfair or fraudulent business act or practice . . . ."

59. "Because Business and Professions Code Section 17200 is written in the disjunctive, it establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair, or fraudulent." (Podolsky v. First Healthcare Corp. (1996) 50 Cal.App.4th 632, 647.)

COMPLAINT

60. The UCL is worded broadly, which has lead the California Supreme Court to observe that it "was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable 'new schemes which the fertility of man's invention would contrive.'" (Barquis v. Merchants Collection Association of Oakland, Inc. (1972) 7 Cal.3d 94, 112, quoting American Philatelic Society v. Claibourne (1935) 3 Cal.2d 689, 698.)

61. Because it contains no express intent, knowledge, or negligence requirement, the UCL "imposes strict liability." (Searle v. Wyndham International, Inc. (2002) 102 Cal.App.4th 1327, 1333; see also Community Assisting Recovery, Inc. v. Aegis Security Insurance Co. (2001) 92 Cal.App.4th 886; South Bay Chevrolet v. General Motors Acceptance Corp. (1999) 72 Cal.App.4th 861, 877.) Nor is it "'necessary to show that the defendant intended to injure anyone.' " (Hewlett v. Squaw Valley Ski Corp. (1997) 54 Cal.App.4th 499, 520.)

62. The UCL has a four-year statute of limitations that commences when the cause of action accrues. (Business and Professions Code 17208.) The UCL's four-year statute of limitations governs even where the predicate law upon which allegations of unlawful business conduct are based has a different limitations period. (See Cortez v. Purolator Air Filtration Products Co. (2000) 23 Cal.App.4th 163, 178-179.) The continuing violations doctrine permits recovery for conduct outside of the limitations period if that conduct "constitutes a continuing pattern and course of conduct as opposed to unrelated discrete acts. If there is a pattern, then the suit is timely if the action is filed within the statutory period of the most recent violation." (Komorava v. National Credit Acceptance, Inc. (2009) 175 Cal.App.4th 324, 343 (citations omitted).)

63. The remedies for a violation of the UCL include injunctive relief and restitution. (Business and Profession Code section 17203.) The remedies available under the UCL are in addition to those available under other laws. Business and Professions Code section 17205 declares that, "[u]nless otherwise expressly provided, the remedies or penalties provided by [the UCL] are cumulative . . . to the remedies or penalties available under all other laws of this state." (See also Stop Youth Addiction, Inc. v. Lucky Stores, Inc., supra, 17 Cal.4th at p. 573; People v. McKale (1979) 25 Cal.3d 626, 633.)

COMPLAINT

64. "By defining unfair competition to include any 'unlawful . . . business act or practice,' the UCL permits violations of other laws to be treated as unfair competition that is independently actionable." (Kasky v. Nike, Inc. (2002) 27 Cal.4th 939, 949 [italics in original].)

65. The unlawful prong of section 17200 "embrac[es] anything that can properly be called a business practice and that at the same time is forbidden by law." (Rubin v. Green (1993) 4 Cal.4th 1187, 1200 [internal quotation marks omitted].) It "borrows violations of other laws and treats them as independently actionable." (Daugherty v. American Honda Motor Co., Inc. (2006) 144 Cal.App.4th 824, 837.)

66. "Virtually any state, federal or local law can serve as the predicate for an action under Business and Professions Code section 17200." (Podolsky v. First Healthcare Corp., supra, 50 Cal.App.4th at p. 647; see also Ticconi v. Blue Shield of California Life & Health Insurance Co. (2008) 160 Cal.App.4th 528, 539; Smith v. State Farm Mutual Automobile Insurance Co. (2001) 93 Cal.App.4th 700, 718.) The UCL thus prohibits "any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." (Saunders v. Superior Court (California Reporting Alliance) (1994) 27 Cal.App.4th 832, 838-839; see also Gafcon, Inc. v. Ponsor & Associates (2002) 98 Cal.App.4th 1388, 1425, fn. 15; South Bay Chevrolet v. General Motors Acceptance Corp., supra, 72 Cal.App.4th at p. 880.)

67. "By defining unfair competition to include also any 'unfair or fraudulent business act or practice', the UCL sweeps within its scope acts and practices not specifically proscribed by any other law." (Kasky v. Nike, Inc., supra, 27 Cal.4th at p. 949 [italics in original].)

68. The unfair prong of Section 17200 "provides an independent basis for relief." (Smith v. State Farm Mutual Automobile Insurance Co., supra, 93 Cal.App.4th at p. 718.) "It is not necessary," therefore, "for a business practice to be 'unlawful' in order to be subject to an action under the unfair competition law." (Ibid.) "In general the 'unfairness' prong 'has been used to enjoin deceptive or sharp practices. . . .' [Citation.]" (South Bay Chevrolet v. General Motors Acceptance Corp., supra, 72 Cal.App.4th at p. 887.)

69. The courts of this state have adopted several tests for determining whether a business act or practice is unfair:

10

COMPLAINT

70. A business practice is unfair "when that practice 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious . . . .'" (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1104, quoting *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530.)

71. Another "test of whether a business practice is unfair involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . ." (*State Farm Fire & Casualty Co. v. Superior Court*, *supra*, 45 Cal.App.4th at pp. 1103-1104 [citations and internal quotation marks omitted].)

72. It also is an unfair business practice when the defendant's conduct "threatens an incipient violation of [a law], or violates the policy or spirit of [a law] because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 187; *see also Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 939.)

73. More recently, one Court of Appeal has fashioned a test for determining whether a practice is unfair based upon section 5 of the Federal Trade Commission Act (United States Code, title 15, section 41 *et seq.*). Under this test, "[a]n act or practice is unfair if [1] the consumer injury is substantial, [2] is not outweighed by any countervailing benefits to consumers or to competition, and [3] is not an injury the consumers themselves could reasonably have avoided." (*Daugherty v. American Honda Motor Co., Inc.*, *supra*, 144 Cal.App.4th at p. 839 [bracketed numbers added]; *see also Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403.)

74. The fraudulent prong of section 17200 "affords protection against the probability or likelihood as well as the actuality of deception or confusion." (Payne v. United California Bank (1972) 23 Cal.App.3d 850, 856.) The test is whether "'members of the public are likely to be deceived.' [Citation.]" (In re Tobacco II Cases (2009) 46 Cal.4th 298, 312.) As the California Supreme Court has explained, "our concern with thwarting unfair trade practices has been such that we have consistently condemned not only those alleged unfair practices which have in fact deceived

the victims, but also those which are likely to deceive them." (Fletcher v. Security Pacific National Bank (1979) 23 Cal.3d 442, 451.)

75. A UCL action alleging violations of the fraudulent prong is "distinct from common law fraud." (In re Tobacco II Cases, supra, 46 Cal.4th at 312.) "A fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for injunctive relief under section 17200 . . . ." (Day v. AT&T Corp. (1998) 63 Cal.App.4th 325, 332.) "This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." (In re Tobacco II Cases, supra, 46 Cal.4th at 312.)

76. Defendants, and each of them, committed acts of unfair competition as defined by Business and Professions Code section 17200 et. seq. by engaging in unlawful, unfair and fraudulent business acts and practices in the State of California. Such acts or practices include but are not limited to the following:

a. Making untrue or misleading representations that Countrywide would be trusted to sell Plaintiffs a mortgage loan that was appropriate to their financial circumstance.

b. Making untrue or misleading representations regarding the true likelihood or circumstances under which Plaintiffs would be able to refinance.

c. Making a mortgage loan and extending a HELOC without regard to whether Plaintiffs would be able to afford monthly payments on the loan and/or HELOC.

d. Aiding and abetting the breach of the fiduciary duty owed by mortgage brokers to Plaintiffs.

e. Failing to provide Plaintiffs with documents sufficient to inform them of their payment obligations with respect to their HELOC.

77. Defendants viewed Plaintiffs as nothing more than a means for producing another loan. The loan was originated with little or no regard for Plaintiffs' long term ability to afford the loan and sustain home ownership.

78. Defendants implemented this deceptive scheme through the use of its former and current employees who earned the trust of the Plaintiffs. These employees encouraged Plaintiffs to obtain purchase money financing with complicated mortgage instruments such as high interest adjustable rate mortgages. The terms of the loans were very difficult for the Plaintiffs to understand. However, Plaintiffs believed that Defendants had their best interest in mind.

79. Defendants eased the underwriting standards and allowed the loan to be processed with no verification or stated income or assets.

80. Plaintiffs were placed in a "piggyback" second mortgage in the form of a 12% interest rate HELOC.

81. The loans were very profitable to the Defendants but detrimental to the Plaintiffs.

82. Plaintiffs have suffered and will continue to suffer substantial injury as a result of Defendants' violations. In addition, Defendant has been unjustly enriched as a result of their unlawful acts and practices.

83. Defendants' acts and practices alleged herein constitute "unfair" business practices, including, without limitation, the following practices: By engaging in the above-described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of the UCL.

84. Plaintiffs allege that by engaging in the above described acts, Defendants violated several laws including the California Unfair Competition Law and must be required to pay restitution related to their unfair, unlawful, and deceptive business practices.

85. Plaintiffs allege Defendants' misconduct described above gave them an unfair advantage over their competitors and the scheme implemented by Defendants is designed to defraud California consumers and enrich Defendants.

86. Plaintiff alleges Defendants' acts and practices are unfair and the harm caused by their conduct outweighs any benefit that their conduct may have.

87. Plaintiffs allege Defendants' conduct described above was malicious because Defendants promised Plaintiffs they would allow Plaintiffs to refinance their loan. Despite stringing Plaintiffs along and keeping their hopes high, Defendants never intended to follow through on their promise.

88. The foregoing acts and practices have caused substantial harm to California consumers, including Plaintiffs and Defendants have been unjustly enriched.

89. As a direct and proximate result of Defendants' actions Plaintiffs may lose their home and has been injured in the following ways: 1) inability to refinance their loan; 2) severe emotional distress; 3) damage to their credit; and 4) attorneys' fees and costs.

90. Defendants should be required to make restitution to Plaintiff and also be enjoined from continuing to engage in such practices pursuant to California Business & Profession Code section 17203.

91. Defendants' acts of unfair competition present a continuing threat to California consumers.  Plaintiffs have no adequate remedy at law, and unless Defendants are permanently enjoined and restrained by order of this Court, Defendants will continue to commit the acts of unfair competition described herein, thereby causing further irreparable injury to Plaintiffs and other members of the public who fall prey to Defendants' scheme.

## FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### PROMISSORY ESTOPPELL

92. The essential elements of estoppel are representation by the principal, justifiable reliance thereon by the third party, and change of position or injury resulting from such reliance." Charity Mission Baptist Church, 90 Cal.App.4th 1116 (2001).

93. Here, the Plaintiffs allege sufficient facts of (1) a representation, (2) justifiable reliance, and (3) a change of position or injury. Moreover, the Plaintiffs can plead additional facts to demonstrate that the Defendants should have reasonably expected or did expect the representation to induce action or inaction on the part of the Plaintiffs.

94. Plaintiffs were advised to seek a stated income loan because they were both self employed.

95. Despite having "excellent credit", Plaintiffs were offered an interest-only ARM on the first mortgage of $1,000,000 with an initial rate of 7.375%. The second mortgage was in the form of a

14

COMPLAINT

home equity line of credit(HELOC). The HELOC was an interest-only ARM for $470,000 with an initial interest rate of 12%.

96. Plaintiffs were told not to worry about the interest rates and they were ensured that they would be able to refinance within a few months.

97. The initial monthly payment on the first mortgage was approximately $7,800 and the initial payment on the HELOC was approximately $4,700.

98. Within a few months Plaintiffs tried to refinance their first and second mortgages as they were promised. However, they were repeatedly told that Countrywides' lending guidelines have changed, unfortunately it was too soon and the comparable sales did not support the refinancing of their home.

99. In reliance on the validity of Defendants' assurance that they would be able to refinance, Plaintiffs' agreed to the terms of the loan. Plaintiffs would not have agreed to the loan terms if they knew that they would not be able to refinance out of the exorbitant interest rates.

## FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### VIOLATIONS OF CALIFORNIA FINANCIAL CODE SECTION 4970

51. Plaintiffs hereby reallege and incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

52. California Financial Code Section 4970 prohibits various acts in making covered loans, including the following: a) Failing to consider the financial ability of a borrower to repay the loan; b) Financing specified types of credit insurance into a consumer loan transaction; c) Recommending or encouraging a consumer to default on an existing consumer loan in order to solicit or make a covered loan that refinances the consumer loan; d) Making a covered loan without providing the consumer specified disclosure.

53. In this case, despite Plaintiffs excellent credit score of 749, Plaintiffs were charged above market interest on their first loan and Plaintiffs were encourage to take out a HELOC to cover the balance of their purchase.

15

54. Plaintiffs were encouraged to take advantage of the Stated Income Program. Defendants did not verify any of the Plaintiffs' income or assets. No consideration was given to whether the Plaintiffs' would be able to repay the loan. Plaintiffs agreed to the interest rates because they believed Defendants were looking out for their best interest.  Plaintiffs did not receive adequate disclosure about the complex loan terms so that they could make a competent decision.

## SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### NEGLIGENCE

55. Plaintiffs hereby reallege and incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

56. The basic elements of a negligence action are: (1) The defendant had a legal duty to conform to a standard of conduct to protect the plaintiff, (2) the defendant failed to meet this standard of conduct, (3) the defendant's failure was the proximate or legal cause of the resulting injury, and (4) the plaintiff was damaged. (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673.)

57.  Under California Financial Code § 4979.5.  (a) A person who provides brokerage services to a borrower in a covered loan transaction by soliciting lenders or otherwise negotiating a consumer loan secured by real property, is the fiduciary of the consumer. A broker who arranges a covered loan owes this fiduciary duty to the consumer regardless of who else the broker may be acting as an agent for in the course of the loan transaction.

58. In this case  there was a fiduciary relationship between the Mirras's and Karen Griese and the Plaintiffs. The Mirras's and Karen Griese were under a legal duty to act in the Plaintiffs' best interest.

59. In California, the test for whether a Financial Institution owes a duty to a borrower has six components: 1) the extent to which the transaction was intended to affect the plaintiff, 2) the foreseeability to harm the plaintiff, 3) the degree of certainty that the plaintiff suffered injury, 4)the closeness of the connection between the defendant's conduct and injury suffered, 5)the moral blame

attached to the defendant conduct, and 6) the policy of defending future harm. <u>Nymark v. Heart Fed.</u>

<u>Savings & Loan Assn,</u> (1991) 231 Cal. App. 3d 1089,1098

60. Defendants had a fiduciary duty to Plaintiffs to disclose all relevant information regarding their mortgage loan so that Plaintiffs could make a competent decision. Plaintiffs were targeted by Defendants and advised to use the Stated Income program because of their Self Employed status. Despite their excellent credit, Plaintiffs were duped into accepting the first interest Only ARM at a rate of 7.37% and the second interest only ARM HELOC at an interest rate of 12%. It was clearly foreseeable that combining these high risk loans with the relaxed underwriting standards of the State Income Program could be detrimental to the Plaintiffs financial well being. Defendants were well aware of the increased likelihood that Plaintiffs could lose their home.

61. Defendants' negligence, however, has done more than merely threaten Plaintiffs homeownership. Plaintiffs credit and credit scores have been destroyed. Plaintiffs' home is in imminent danger of foreclosure. Plaintiffs suffered, and continue to suffer, general and special damages in an amount to be determined at trial, including, but not limited to attorneys' fees and costs of bringing suit to dispute.

## SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

62. Plaintiffs hereby reallege and incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

63. As alleged above, Defendants owed Plaintiffs a duty of care in the loan origination process. Defendants breached that duty when they failed to look out for Plaintiffs best interest by luring them into a subprime loan with the promise that they would be able to refinance quickly.

64. As a result of the acts of Defendants, Plaintiffs suffered, and continues to suffer from extreme anxiety, loss of self-esteem, headaches, depression and other emotional issues.

65. As a direct and proximate result of the negligence and carelessness of the Defendants as set forth above, Plaintiffs suffered, and continues to suffer, general and special damages in an

17

amount to be determined at trial, severe emotional distress, including attorneys' fees and costs of bringing this suit.

## EIGHTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### NEGLIGENT MISREPRESENTATION

66. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

67. Courts typically define the tort of negligent misrepresentation as a false statement that brings about "a pecuniary loss[] caused by justifiable reliance on those statements"

> *Tschimperle v. Aetna Cas. & Sur. Co., 529 N.W.2d 421 (Minn. Ct. App. 1995); Allstate Ins. Co. v. Miller, 743 F. Supp. 723,726 (N.D. Cal.1990)* ( classifying negligent misrepresentation as a type of fraud and defining it as "the" assertion as a fact of what which is not true, by one who has no reasonable ground believing it to be true" and "the suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact" Quoting Cal. Civ. Code §§1572 and 1710.

68. Negligent misrepresentation lacks the element of knowledge of the falsity of the representations. Therefore, "where the defendant makes false statements, honestly believing that they are true, but without reasonable ground for such belief, he may be liable for negligent misrepresentation, a form of deceit.'[Citation] *Billy v. Arthur Young & Co ( 3 Cal.4th 370,407-408 quoting 5 Witkin, Summary of Cal. Law (9thed. 1988) Torts §720,p.819.*

69. Plaintiffs were offered an interest-only ARM on the first mortgage of $1,000,000 with an initial rate of 7.375%. The second mortgage was in the form of  a home equity line of credit(HELOC). The HELOC was an interest-only ARM for $470,000 with an initial interest rate of 12%.

70. Plaintiffs were told not to worry about the interest rates and they were ensured that they would be able to refinance within a few months. However, within a few months Plaintiffs tried to refinance their first and second mortgages  as they were promised and they were denied.

18

71. Plaintiffs are threatened with great pecuniary loss because they have not been able to refinance out of the exorbitant interest rates, the credit has been adversely effected and they are in jeopardy of losing their home.

72. Defendants' misrepresentations and subsequent actions evidence sheer negligence, which caused Plaintiffs intolerable injury by threatening to uproot them from their humble abode.

73. Plaintiffs request damages to compensate for the Defendants' aforementioned negligent conduct and fraudulent actions.

## NINTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

### (California Consumer Credit Reporting Act, Civil Code §1785.25)

74. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

75. Under California Civil Code §1785.25(a), A person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate.

76. Defendants violated California Civil Code § 1785.25 (a) because Defendant furnished information it knew to be incomplete and/or inaccurate to a credit reporting agency.

77. Defendant reported negative information to credit reporting agencies and failed to report the debt as disputed.

78. As a result of Defendants' violations of the Consumer Credit Reporting Act, Plaintiffs have suffered damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

### (FAIR HOUSING ACT and EQUAL CREDIT OPPORTUNITY ACT VIOLATIONS)

79. Defendant's residential lending-related policies and practices and the policies and practices it followed in residential credit transactions constitute:

19

   a.   Discrimination on the basis of race and national origin in making available, or in the terms or conditions of, residential real estate-related transactions, in violation of the FHA, 42 U.S.C. § 3605(a)

   b.   Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of the FHA, 42 U.S.C. § 3604(b)

   c.   Discrimination against applicants with respect to credit transactions on the basis of race and national origin, in violation of ECOA, 15 U.S.C. § 1691(a)(1).

80. Plaintiffs fell victim to Defendants' practice of discrimination and denial of rights. In addition to higher direct economic costs(high interest rates), Plaintiffs suffered additional consequential economic damages resulting from having an excessively costly loan including, severe credit problems, default, threat of foreclosure and other damages, including emotional distress.

81. Plaintiffs are aggrieved applicants as defined in the FHA, 42 U.S.C. § 3602(i), and aggrieved applicants as defined in the ECOA, 15 U.S.C. § 16913, and have suffered injury and damages as a result of Defendants' conduct.

82. Defendants actions were intentional, willful, or implemented with reckless disregard for Plaintiffs rights.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray as follows:

   1.   For compensatory, special and general damages in an amount according to proof at trial;

   2.   For punitive and exemplary damages in an amount to be determined by the Court;

   3.   Pursuant to Business and Professions Code section 17536, that Defendants, and each of them, be ordered to pay a civil penalty in the amount of two thousand five hundred dollars ($2,500)

for each violation of Business and Professions Code section 17200 by Defendants, in an amount according to proof.

4.      Pursuant to Business and Professions Code section 17206, that Defendants, and each of them, be ordered to pay a civil penalty in the amount of two thousand five hundred dollars ($2,500) for each violation of Business and Professions Code section 17200 by Defendants, in an amount according to proof.

5.      For an order compelling Defendants to disgorge all amounts wrongfully taken from Plaintiff and returning to her the same, plus interest thereon at the statutory rate from the date the funds were first received from Plaintiff; and

6.      For reasonable attorney fees and costs in this action and such other and further relief as the Court may deem proper.


Dated:  March 26, 2014                     LAW OFFICES OF JOHNSON|OMOTOSHO, LLP




                                           By: _____
                                                Ayo Omotosho, Esq.
                                                Attorney for Plaintiffs,
                                                Tyrone Potts
                                                Rachelle Potts

COMPLAINT

## VERIFICATION

I have read the foregoing **VERIFIED COMPLAINT FOR DAMAGES**  and know its contents.

I am a party to this action and make this verification in my capacity as the Plaintiff. The matters stated in the foregoing document are true of my own knowledge except as to those matters  which are stated on information and belief, and as to those matters I am informed and believe that they are true.

Executed on March 18, 2014, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
Tyrone Potts
Plaintiff

_____
Rachelle Potts
Plaintiff

VERIFICATION
1

## DECLARATION OF TYRONE POTTS

I, declare as follows:

1. I am a resident of the County of Los Angeles. I am over the age of 18. I have personal knowledge of the facts herein, and if called as a witness, I would competently testify to their veracity in court.

2. I am the owner of the property known as 14400 Greenleaf Street Sherman Oaks, CA. 91423.

3. In early December 2006, my wife and I began our search for a new home. We had been renting for 3 years since we moved to San Fernando Valley. We received a referral to Waterview Financial to assist with obtaining financing. Nancy Mirras, a loan consultant and also the co-owner with husband Nick, ran my credit score and informed me in email dated December 15, 2006 "the mid-range was 749" and stated that was, "Excellent!"

4. Mrs. Mirras also issued us a prequalification letter on that same day to assist us with our search. Our initial prequalification was for $1,400,000 (a first mortgage of $1,050,000 and a second for $350,000). With the prequalification letter we were able to schedule several home viewings with our realtor, Mrs. Keeley Garth. Within days we found a home that we wanted to make an offer on.

5. The Mirras' continued to shop for a loan for us. My wife and I were advised to seek a stated income loan as we were both self-employed. We were not required to provide any documentation verifying our income.

6. We had two promising offers. One potential lender had great interest rates but required $17,500 down. Countrywide lured us in by promising to finance 100% of the sales price. The Mirras' were former employees of Countrywide and had a good working relationship with the Countrywide Lending Agent, Karen Griese. We decided to go with the Countrywide offer.

7. We received an appraisal from Nationwide Appraisal Services Corporation on December 28, 2006. The appraised value was $1,470,000. Our realtor wrote an offer and eventually

1   we agreed to purchase price of $1,470,000. We opened 30 day escrow at the beginning of

2   January 2007.

8.  The Mirras' turned the deal over to the Mrs. Karen Griese. Mrs. Griese and her son
    Robert worked toward locking in our interest rates on our first mortgage and our home
    equity line of credit (HELOC) as our second mortgage.

9.  We were not told about the interest rates and the effect that they would have on the
    overall price of the loan.

10. The rate offered on our first mortgage of $1,000,000 was 7.375% interest-only ARM.
    The HELOC was a $470,000 loan. HELOC was also interest only ARM with an initial
    interest rate of 12%.

11. We were concerned about the high interest rate and confused as to how the rates were so
    high given we had what they called "Excellent" credit.

12. The Griese's told us not to be concerned about the rates, especially the HELOC, as they
    would be able to get us refinanced within a few months. So, my wife and I agreed to the
    loan terms and signed the loan documents.

13. Initial monthly payment on the first mortgage was approximately $7,800 and the initial
    payment on the HELOC was approximately $4,700.

14. We were able to close our loan on January 31, 2007. After the transaction was over we
    kept in touch with the Grieses.  We gave them a few months as we were told and then we
    began to inquire about the refinancing that was promised to us as we were eager to get
    our interest rates and payments down. I spoke to Robert regularly about the timeline for
    refinancing, the answers we received were: our lending guidelines have changed,
    unfortunately it was too soon and the comparable sales would not support the refinancing
    of our home. This went on for at least a year to no avail. Eventually the phone calls
    stopped and we began a string of emails from December 2007 – March 2008. We were
    never granted a refinance by the Grieses and Countrywide during this period.

15. My wife and I were extremely disappointed that the Grieses and Countrywide did not
    make good on their promise to get our loans refinanced.  We were frustrated, because we

DECLARATION OF TYRONE POTTS
2

would have never accepted the loans had we known we would not be able to refinance in short order as we were lead to believe. We would have continued to shop the loans until we were able to secure more affordable rates. However, we never complained. My wife and I continued to make the payments on our first mortgage and HELOC. We grew to love our home, our next door neighbors and our neighborhood and hoped that someday we could raise a family in our home. But we were worried and lived in constant fear that someday the interest rates on both loans would make it impossible for us to keep making the payments.

16. My wife and I have never lived extravagant lives, but we even began to streamline our modest lifestyles. We cut back to a bare minimum on eating out. We substituted video rentals for our nights out to the movies. We purchased floor heaters for our bedroom instead of heating the entire house in winter and used fans instead of air conditioner in summer. I cut my own hair instead of attending a barbershop and my wife ceased visits to beauty shop. Our vacations became stay-cations. My wife's mom and brother came to visit us instead of us visiting them. Unfortunately none of this was enough.

17. The summer of 2008 I lost a major contract. We still had not been contacted by the Grieses about granting us refinancing for our loans. Since we couldn't get our loans refinanced, in August 2008, we came to the extremely difficult decision to start making partial payments on both home loans in order to be able to manage the basic necessities: food, gasoline, car insurance and utilities. This continued through November 2008. Failure to make our loan payments had a negative impact on our credit. We also had to stop making credit card payments. Most credit cards cancelled us, and raised our interest rates for defaulting on payments. Our poor credit scores impacted our ability to get jobs when we tried to transition from self-employment. I'm a licensed certified public accountant, yet jobs I was overqualified for such as entry-level accountant for city of Santa Monica turned me down.

18. December 2008 we had to stop making payments on both loans. In January 2009 we were offered a loan modification on our first mortgage that did not take into consideration what

1      we could afford to pay. Our HELOC was never addressed. We defaulted on that loan

2      modification later that year and Countrywide began the foreclosure process. In an effort

3      to salvage our tarnished credit we offered to sell our home. Art Schlefstien and Alicia

4      Fayhe were the husband and wife team we chose as our agents. It was difficult for me and

5      torture for my wife watching people parade through our home. Eventually my wife

6      started leaving home whenever potential buyers came to view our home. She cried often

7      and we both suffered many sleepless nights.  March 2010 they found a buyer, but we just

8      couldn't bring ourselves to sign the papers accepting the offer.  The foreclosure process

9      started again.

10   19. We contacted Neighborhood Assistance Corporation of America (NACA) to see if they

11        could assist us in obtaining affordable loan modifications. We had heard many wonderful

12        and miraculous testimonies about how NACA was able to help people save their homes

13        because NACA had contracts with all the major banks/lenders. So we were excited about

14        the possibility that we had finally found a solution to the nightmare we faced over losing

15        our home.

16   20. We were informed that NACA could not address our HELOC but might be able to help

17        us obtain a permanent affordable mortgage solution for our first mortgage. We figured

18        that although this wouldn't completely solve our problems, at least it was a step in the

19        right direction. We attended the mandatory workshops and submitted all the required

20        paperwork. We even performed volunteer work required as participants in NACA's

21        "Save the Dream" program.

22   21. NACA was able to temporarily stop the foreclosure process as they submitted a request

23        for loan modification for us. The process was extremely difficult. Bank of America (B of

24        A) which bought out Countrywide took over our loan servicing.  Our B of A Customer

25        Relationship Manager (CRM) was constantly changing. We received letters and

26        telephone calls notifying us of these changes, but it was still extremely difficult to keep

27        track of the process with all the constant change.  We were told files were misplaced on

28        several occasions and that they needed more time to research our case. We waited

DECLARATION OF TYRONE POTTS

4

patiently in hopes that ultimately this would be resolved and our need for an affordable
mortgage would be met, to no avail.  Eventually we were rejected as B of A determined
we did not have sufficient income to support granting the loan modification. We were
devastated, heart-broken but undeterred.

22. In February 2011, I applied for a job with my church denomination, Church of God in
Christ, Inc. After a lengthy interview process, which included a trip to Memphis, TN
where our church is headquartered to complete an analysis report, I was given a
conditional offer of employment. After they ran my credit report, I had to have a detailed
discussion with the Bishop (Chief Executive Officer), Chief Operations Officer and head
of security. The Bishop has also been my pastor since 1992. It was the most demeaning
and humiliating experience I have ever had in my life. I desperately wanted this job, so I
humbled myself and answered every question they asked about my financial predicament.
I understand why they had to interrogate me. I was asking for a job where I would be
responsible for managing the financial affairs of the entire organization. I believe it was
only by the grace of God they decided to take a chance on hiring me. My wife somehow
managed to obtain an entry-level position in the call center at Kaiser Permanente in
November 2010 as well.

23. Our credit has been negatively impacted as a result of the high interest rates on our loans.
I was distraught and overwhelmed. From 2007 – 2009 we had accumulated some
$200,000 in credit card debt as we fought to manage our finances. As soon as we
obtained jobs, we began to pay off our credit cards in hopes that this would help us obtain
an  affordable loan modification.  To date we have paid off or settled all our credit cards
except for one which has approximately a $5,000 balance.

24. It took over two years but B of A finally offered us a trial loan modification in 2013. We
were to pay about $6,200 per month for 3 months then they would tell us what the terms
were for a permanent modification.  Again, we do not believe this modification took into
consideration what we could actually afford to pay. It did not address the $470,000
HELOC and the language suggested that the trial payment amounts could go up even

higher.  We were saddened, distraught and finally broken by this second predatory loan modification offer.  We declined the loan modification in June 2013 and in great distress agreed to sell our home.  My wife was so emotionally impacted by this process that she began to see a psychiatrist last summer in hopes it would help her cope.  To add insult to injury, B of A transferred servicing of our loan to Nationstar. So this disqualified us from receiving approximately $30,000 in relocation assistance from B of A for agreeing to sell our home.

25. We have endured another eight months of interested buyers parading through our home.  At present, Nationstar is entertaining offers. We may be forced to leave our home by this summer.

26. I began to do research and I found that we were not the only people who suffered as a result of Countrywide's false promises.

Sincerely,

_T Potts_

Tyrone Potts, CPA

DECLARATION OF TYRONE POTTS

6